ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

JOSEPH ANTHONY HOF, in my personal capacity,
as the aggrieved party, and individually, as the
Complainant, and as,

Plaintiff

v.

Eric Adams, in his official capacity as the Mayor of
the City of the City of New York, and THE CITY OF
THE CITY OF NEW YORK, including the mayoral
department known as, THE NEW YORK POLICE
DEPARTMENT, and Jordan Vogel and Christina
Smyth, in their official capacities, as the disclosed
agents of BENCHMARK 237, LLC, a Delaware
Limited Liability Company, altogether,

Defendants

**Complaint for Civil Rights Violations**

Case No. CV 23-4931

Jury Trial: ___Yes ✓ No

KOMITEE, J. BLOOM, M.J.


RECEIVED
JUN 30 2023
PRO SE OFFICE

## PARTIES

1. I, Joseph Anthony Hof, am a *pro se* plaintiff, a personal witness to the events, and a

citizen of the United States of America and a resident of New York, New York. I filed this civil

suit against the Defendants because of the irreversible psychological harm that they have caused

me, and for all of the lost time that I will never be able to get back, during the prime years of my

life. The Defendants, acting through their disclosed agents, individually and concertedly,

committed several individually-actionable tortious acts, such as Intentional Infliction of

Emotional Distress. In addition, the Defendants violated my civil rights under Title 8 of the New

York City Administrative Code and 42 U.S.C. §§ 2000e—1-17. I am seeking relief in the forms of injunctive relief, monetary relief and punitive relief. My contact information is on file with the Defendants and with the Clerk's Office.

2. The City of The City of New York ("the City") is a Defendant. The City is a political subdivision of the State of New York. The Mayor of the City is Eric Adams, who, in his official capacity exercises control over the mayoral department that is the New York Police Department (NYPD). The Mayor also appoints members to the Rent Regulation Board. The City may be served via mail at the Office of the New York Comptroller at 1 Centre St. # 530 in New York, New York, 10007 and (212) 669-3916.

3. Benchmark 237, LLC is a Defendant, a Delaware-domiciled, foreign, limited liability company, with a principal place of registered business is in the County of Suffolk, State of New York. Benchmark 237, LLC is the Plaintiff's lessor, the owner of the Plaintiff's leased apartment. Benchmark 237, LLC's registered address for service of process purposes is 270 Lafayette St., Ste. 1205, New York, New York, 10002. Benchmark 237, LLC, d/b/a, "Benchmark Real Estate Group", the Plaintiff's landlord and property manager, is at 20 E. 69th St., Ste. 2A, New York, New York, 10021, and at (212) 431-0891. Benchmark 237, LLC is represented by counsel at Smyth Law, P.C., 355 Lexington Ave., 9th floor, New York, New York, 10017, (212) 682-2020.

ILLEGAL DETENTION

4. On April 4, 2023, I made two phone calls to "911", first at 8:03 a.m. and a second time at 8:24 a.m., to ask the dispatcher for help in removing a guy whose overnight stay evolved from that of an "invitee" to that of "trespasser". I called "911" as a last resort, begrudgingly, and only after I made it abundantly clear to the trespasser, both subjectively and as a matter of reasonable

objectivity, that I had revoked my permission for him to be in my apartment. At 39 years old, I have never felt the need to have to make *that* call before. I never will again. I fled the scene while my dog while making the second call at 8:24 a.m.

5. By the time the NYPD responded, I was still outside, walking my dog around the block. I was called by a police officer and told to continue to wait outside. I waited outside but I also started to walk back towards the vicinity of the corner of the apartment building's nearest major cross street. Then, I was called a moment later and told to go inside and hurry or they were going to break down my apartment unit's door.

6. Upon entering my building again and getting up on to my floor, I personally observed several officers were lined up in front of my apartment unit door resembling airborne soldiers leaning on to each other readying to jump out of a perfectly good airplane, but instead, police officers were lined up, several officers deep, leaning against each other with an appearance that seemed to me like they were about to at any moment, break down my apartment unit's door. I didn't understand what was occurring before my eyes. It certainly did not resemble the type of modest response to a domestic violence scene that I had in mind, given what others have told me their experience was in making such a call to "911" before. I asked and they said that he had locked himself inside. I gave an officer my key. Then, I was told to go up to the roof and wait a while so that is what I did with my dog.

7. After waiting a while, I decided to start descending from the roof top back down to the floor where my apartment unit is located. As I approached the floor, I noticed outside the apartment and in the hallway, two officers who appeared to tend to wounds. A female officer was sitting on the stairwell as I approached her from behind, and she appeared to be wiping

blood from her face. A second male officer also appeared to tend to his face, as he was walking about. The scene seemed surreal to me, like I couldn't believe what was occurring before my eyes. I glanced towards my apartment unit's door, and it was closed. I asked and the two officers and I engaged in a bit of conversation. The police officers were, I was told, inside my apartment. I was told that three officers were injured by the trespasser. I did not observe the fights, since I was obviously several flights above where the altercation would have taken place, presumably inside my apartment. It left me confused, in disbelief, and extremely apologetic to the officers for being a but-for cause of their injuries, even if I wasn't a direct cause of their injuries.

8. During the Incident, I was at various times told by police officers and at their direction, to go outside my building, go inside the building, go on to the roof of the building, and inside my apartment unit, while there with about a dozen officers after the trespasser had departed the vicinity.

9. It took me a long time to process my feelings of that day, and try to decide what to do. I finally decided to file this cause of action after reading that what I experienced that day has an actual name, and others must have experienced it too. It is called false imprisonment, the illegal detention that I experienced, given the fact that I was not charged with anything subsequently. I was detained by police officers for approx. two hours as I was being volleyed around like a volley ball by them. I was tired, thirsty, exhausted, and trying to tend to my 36-pound Frenchie who was also becoming over heated and very tired. I have asked numerous friends and family members who have had to make *that* before to "911", and nobody has ever told me they experienced anything like what I experienced that day, not even close. **The entire street block**

**was shut down with dozens of police vehicles, a fire engine, a reporter, (so my neighbor and I think), and an ambulance.** By being told I couldn't go certain places at certain times, I was in legal affect, being kept away from those places, and kept, or detained to only the places that the police allowed me. Then when the officers told me at times precisely where and when to be, I was very limited in where and when I could go. Sometimes I did not know the basis for why I was being kept away from certain places at certain times, like the elevator, where I vividly remember, at one point in time, my view of the inside of the elevator being obstructed purposefully by officers, as if they were trying to conceal something from me. I asked if it was the trespasser or something related to his affects, and I was told no. I don't know why the officers felt the need to conceal the evaluator at that time, nor do I know what was occurring for two hours in my apartment, since I was kept from it. I can only speculate. Bottom line is that I was essentially detained during the incident. I was not ever read any miranda rights. I was questioned multiple times, however. I later asked the Assistant District Attorney, and she told me that I was never under investigation and that I am presently not under investigation. I was unlawfully detained and falsely imprisoned.

10. In addition, throughout the incident, the officers asked me personal questions of an obviously sensitive nature, and at times out loud and in public where there exists no objective sense of privacy, and yet, the questions the officers asked me were obviously private questions. They sometimes asked me the same question different ways, with raised voices, with commanding demeanors, and on occasion while inside my apartment unit after they had gained entry in to it, while some of my personal belongings laid ruined around our feet, including a

bloodied American flag, and my bed, destroyed. My mattress for some reason was not in the bedroom, but was on its side in the living room.

11. Even my neighbors were impacted, kept at times from going into the building. At one time, I was on the sidewalk, and my neighbor approached me while an officer was talking to me on the sidewalk. She asked me how I was doing and appeared to try to comfort me and check in with me. The officer yelled at her and told her to stay away.

12. I was told near the end of the Incident by the ninth precinct officers that the trespasser was being escorted and transported away in an ambulance, and that he was at a hospital. I was on the sidewalk and I could see several officers around a stretcher being loaded in to an ambulance. I didn't see the person on the stretcher. Upon being granted access back into my apartment unit, I noticed that it was a mess, and my bed was destroyed, and the American flag that had been inside a shadow box was outside of the box and had blood all over it. Many items were thrown about. Two pieces of pottery sentimental to me, had been destroyed. A paper towel roll that had a burnt, dark marks to it, as if it had been set aflame, was inside the sink.

13. When asked, I told the officers I observed probably approx. $300 in damage. One officer replied in a very loud, "$300?!" as if he was surprised. Of the things destroyed, the most prominent was the bed, but the bed's feet had already been cut in half by me two years earlier so that it was shorter so my dog could jump more easily on to it, so, in terms of value, it was already close to no value at all during the incident. The officers asked me three times before they departed the vicinity of my building, including my building, and once a fourth time later in the day, a general question relating to a nexus between me and the trespasser. They seemed to ask

the same question multiple times with raised voices. I recall how embarrassed I was when the officers asked questions pertaining to a personal nature, such as the time one officer yelled "what is cruising?!" when I used the term casually, half-heartedly, and almost jokingly, after having to describe for a *third* time, how my path had serendipitously intersected with that of the then-invitee the night before.

14. Following the morning of April 4, 2023, I felt like I was mistreated when I went in to the ninth precinct, mainly to follow up about two things - first, I really wanted the trespasser's belongings out of my apartment, and despite the District Attorney's office telling me that the officers would come back and get it, they never did. Second, I really desired a copy of the incident report, and I had written a statement, in anticipation of the need to turn it in to the police. But they never took it. Instead, I used the draft and it evolved in to the body of a motion to quash subpoenas to appear before the grand jury against the trespasser just three days later, despite my verbal protests to the contrary. The afternoon of April 4, 2023, I walked to the ninth precinct and intended to ask the officers about his belongings because I was assured that they would return to my apartment to repossess his belongings. After standing there for several minutes and waiting, nobody asked me what I was there for, so I left. I went back that evening, and I asked the officers there about his items because I really felt uneasy with them there, and I wanted them out of my apartment. An officer that was at the scene of the incident came around the corner and saw me and asked how he could help me. I asked him and the desk officer about the trespasser's stuff that he possessed prior to being inside my apartment, such as a black backpack, a Target bag and a wooden bow. I told the two officers there and then that I was concerned at the premise of keeping his items for very long, because, besides the obvious

discomfort, I did not want anyone thinking that I was responsible for the trespasser's belongings while they remained in my apartment. Specifically, I told the two officers that I am concerned about keeping my own sensitive belongings in my apartment building, and I would not be able to demonstrate exclusive custody over *his* possessions, much less control over them. The officers told me to keep the trespasser's belongings and that in a few days, presumably April 7, 2023 timeframe, I would be contacted by the NYPD and the trespasser to set up a time to collect his belongings. As of April 10, 2023, the trespasser's belongings were still in my apartment. I ended up mailing his business papers and backpack to his attorney at the Legal Aid Society, several days later. I threw away the spoiled food in the Target bag of food. The wooden bow? It is still in my apartment as of June 28, 2023. I've no idea why the guy carried a wooden bow around.

15. I reminded the two officers at the ninth precinct on April 10 2023, of the two complaints for investigation filed online by me on March 19, 2023, after telling the officers at the scene of the incident the same. The first "311" complaint with reference number 4124664, had already been rejected on March 29, 2023 as not warranting investigation. The second complaint with reference number 6612630 was still alive. I thought it could possibly be relevant that some of the facts that I alleged in the complaints could *possibly* relate to the events of April 4, 2023, I don't have any idea. (For background, I do not remember exactly what I wrote in those two complaints, but I wrote about feeling like someone could be stalking me. I also wrote about coming home to my apartment and feeling like an individual or individuals had been present in my apartment while I was away and without my permission. I wrote at the end of one of the complaints, something to the affect of, "Please help me, I am always afraid.").

16. After leaving the ninth precinct the evening of April 4, 2023, I went to bed and slept in. Upon awaking on April 5, 2023, I noticed that I had I received an email from the NYPD with a time stamp of 10:01 a.m., which provided that my *second* complaint of March 19, 2023, was rejected by the NYPD as not warranting investigation, less than fourteen hours after my visit to the Ninth Precinct to in part remind them about it.

<u>OVERUSE OF AUTHORITY and ABUSE OF POWER</u>

17. The basis for my claims against the City are in large part through the NYPD for tortious injuries and discriminatory harassment, in violation of my protected civil rights, both on or about April 4, 2023, and since, including specific tortuous acts that the police officers made while responding to my apartment and my own calls to "911" for help, such as illegally detaining me for approx. two hours.

18. Domestic violence responses are the single most frequent type of response the NYPD makes. On average, the NYPD makes approximately 600 or so such responses, daily. The response of the NYPD to my apartment building on the morning of April 4, 2023, could not have closely resembled anything like the other 599 or so domestic violence responses that day in New York City. The police officers' use-of-force while responding to my apartment was totally incongruent to the risk presented at the scene to which they were dispatched. They not only *didn't* extend victim rights to me, which I would only later learn about through my reading of them, but they abused their power, in their exercise of their occasionally-homophobic authority and control over me, illegally detaining me and my psychiatric service animal <u>*out of*</u> my apartment unit, for more than two hours, leaving only my imagination left to speculate and form a foundational basis as to what could have occurred inside there, to possibly justify my being

detained away from it and falsely imprisoned, elsewhere, for two hours, long *after* a trespasser had been allegedly subdued.

<u>TENANT HARASSMENT</u>

19. Benchmark 237, LLC is a party to this suit because of the tenant harassment they have subjected me to, in order to try to motivate me to leave my apartment, following the events of April 4, 2023. In fact, my own neighbor down the hall from me recently remarked to me on June 8, 2023, how he is, "convinced that they [the property manager and owner Benchmark 237, LLC] are trying to get [me] to move out." (source: plaintiff's memorandum to self (Jun. 9, 2023)).

20. Benchmark 237, LLC, through their agents, including the President and Chief Executive Officer Jordan Vogel and Mr. Vogel's attorney, Christina Smyth, tortiously harassed me, their tenant, by bullying me, making false representations to me, re-directed me, and decreased building-wide services. In addition, they failed to reimburse me for paying for repairs in the first instance after acknowledging that they would. They overcharged me, I have only recently discovered, in the fraudulent execution of five leases with me over the past seven years. **Benchmark 237, LLC deprived me of the most fundamentally-basic landlord duties which should be owed to any human in a tenancy in this supposedly progressive City.**

<u>OVERCHARGES</u>

21. In May, 2023, I began to get fed up with what I believe to be tenant harassment following the events of April 4, 2023. Meanwhile, I began to learn about common overcharges, mainly through the word-of-mouth experiences my friends were having with *their* own landlords within this decaying island of rotted and soot-laden tenements. Since October, 2016, I have paid

Benchmark 237, LLC, approx. $216,000, under six lease agreements. I learned that I have been overcharged by Benchmark 237, LLC for two reasons contrary that are each contrary to the law - 1) intentional failure to accommodate my request for a two-year lease commencing September 1, 2020, and 2) increasing my rent by a percentage that is above that permitted by the City beginning with the lease that commenced September 1, 2021. Upon realizing this in mid-May, 2023, it occurred to me that the amount in controversy between my landlord and I, with those two issues alone, is *more than* my June, 2023 rent of $3,420, so I told Benchmark 237, LLC, that I was intentionally not paying my June, 2023 rent - the first time in my life that I as a 39 year old did not pay my rent - while I assured them that I would spend the month of June, 2023, to try to fully adjudicate the amount of money that I believe I am owed, ahead of July 1, 2023 (meaning before July rent is due). It is worth noting that I have since spent hundreds of hours, with no help by them, since mid-May 2023, to follow through with my commitment. I have not even been able to speak with the landlord's attorney, Ms. Smyth, on behalf of her client for her to hear a settlement offer and relay it to her client, because she has simply refused to hear me.

22. So I set out in early June, 2023, to follow through with my commitment to my landlord. Between June 1, 2023 and June 26, 2023, I spent hundreds of hours researching data sets, meeting with various City departments in person, including the Finance Department and the Housing and Preservation Department.

MORTGAGE FRAUD

23. While conducting research in to the legal issues surrounding tenant harassment, overcharges, and the true rent regulated nature of my apartment building and unit, I did uncover on the City's Finance Department's website a loan agreement executed between Mr. Vogel on

behalf of Benchmark 237, LLC, and then-Signature Bank, on November 18, 2018, with a presumably cardinal provision that is a description of the apartment building, the mortgaged property, that serves the basis of then-Signature Bank's $6,700,000 loan to Benchmark 237, LLC. *See* the mortgage agreement at section 1.27 on .pdf page 32 of 53.

Section 1.27.  Rent Stabilization/Control. (a) (A) The Mortgaged Property is a building with an aggregate of twenty-four (24) residential units and one (1) retail unit.  The Mortgagor covenants, represents and warrants that it has complied with the registration requirements of the Omnibus Housing Act of 1983 as the same may be amended from time to time (the "Housing Act") with regard to each of the apartment units in the Mortgaged Property, (each a "Unit"), as follows:

The issue is that the mortgage agreement's description is totally inconsistent with reality, which is that the building has twenty-eight (28) residential units and no retail units.  There's more; the mortgage agreement goes on to allude to building-wide services provided by the property manager, which are simply not provided by the lessor, not at all, not even close.  All in all, an objectively reasonable reading of the mortgage agreement in its entirety, is that the basis of the conveyance of more than six million dollars from the bank to the owner of the mortgaged property, is that *all* the apartment units in the mortgaged property are stabilized, or controlled, not just some of them.  It is clear that there multiple untrue provisions in the mortgage agreement.  Even the most novice individual, following a five-minute walk-through of the mortgaged property, would come up with a description of the mortgaged property which is wholly inconsistent with that described in the mortgage agreement, and it would probably be more accurate, too.

24. My position at trial is that there are only two sources of authority that are presently ruling over my tenancy, and they are - 1) The Housing Stability and Tenant Protection Act of 2019, and 2) the November 18, 2018 mortgage agreement with New York Community Bancorp, Inc. (New York Community Bancorp, Inc.'s wholly-owned subsidiary, Flagstar Bank, N.A., bought all of Signature Bank's notes as of on or about March 20, 2023). My current lease agreement with Benchmark 237, LLC, is unenforceable for at least three reasons. First, it was executed under false pretenses. Second, it contemplates that The Housing Stability and Tenant Protection Act of 2019 does not apply to my tenancy. It does, since the commencement of my tenancy started on September 1, 2019, *after* the affective date of The Housing Stability and Tenant Protection Act of 2019. Third, the lease agreement contemplates a market rate rent amount contrary to, and far exceeding, the legally-permitted rent considering successor rights and the prior tenant who was almost certainly paying a rate consistent with that of a rent stabilized, or rent controlled, unit. The lease agreement contemplates a market rate rent of $3,420. I had no idea until during the course of all my research in June, 2023, that the prior tenant was paying a rent stabilized or rent controlled monthly rent. When I moved in to it, it was *after* the effective date of the The Housing Stability and Tenant Protection Act of 2019, and the unit could not be de-regulated *unless and until* certain restrictive conditions were satisfied. It is my position at trial that such conditions have *not* been satisfied, during the time period between the termination of the prior tenant's tenancy and the commencement of my tenancy on September 1, 2019. I enjoy successor rights from the tenant that lived in my unit prior to me. Who lived in my apartment unit prior to me and how much was that individual paying? I have not been able to definitively answer that question, and I need the discovery process of litigation

to reveal that factoid since the landlord and its attorney will not communicate with me. They won't even answer my phone calls. I asked five long time residents of the apartment building, and all five of them told me more or less the same thing, which is that they believe a woman lived in my apartment unit prior to me and for many, many years, and she was paying a rate consistent with that of a rent controlled or rent stabilized unit. Even if she was't, I have looked at the rate provided by the City's Housing and Preservation Department, both under the pre-2019 law and the post-2019 law, and it is nearly impossible to believe that anyone was paying a rate above the threshold of de-regulation, since the deregulation threshold rate would have been so close to market rate. There were certainly no major capital improvements put in to the apartment unit. (One of my issues of dispute is that the landlord will not reimburse me after I paid in the first instance, approx. $750 to replace the bathroom sink and vanity after the old one, the oldest I've seen in the building, was so rotten it needed to be replaced). I live in a rent stabilized or rent controlled apartment unit and that my lease agreement with Benchmark 237, LLC is unenforceable.

## DEFENDANTS' ALTER EGO - ONE AND THE SAME

25. On or about June 2, 2023, I e-mailed Benchmark 237, LLC's President and Chief Executive Officer, Mr. Jordan Vogel, to inform him of an emerging dispute between us. He re-directed me to "[his] attorney". I began to feel uneasy, given my status as both an attorney and a tenant. I wanted to be sure to be extra cautious in proceeding, because I did not want to take a mis-step that could later be construed as being sideways with a professional responsibility as a member of the bar. It seemed to me with Mr. Vogel's June 2, 2023 e-mail to me, like he was positioning, touting his attorney's presence in a way to intimidate me, because I don't think he

would have reason to believe that I myself am an attorney, at least not on June 2, 2023. I had no idea of Ms. Smyth's role on the City's Rent Regulation Board, until on or *after* June 2, 2023, which is when I learned of Ms. Smyth's role on the Board only through casual Googling of her to try to ascertain her contact information, because she was *so* unresponsive to me, I thought for a moment that her legal office was defunct. I still think her legal office could be defunct. I really have no idea. I am still confused given the ambiguity of the parties here. In essence, Ms. Smyth has been to me acting as the disclosed principal and agent for my landlord and the property manager and the property owner, even though I essentially just send her emails to update her files, worrying whether she will snap back at me. In other words, she is to me the landlord, even though she and I both recognize each other's attorney statuses. Her role relative to me as a tenant is obviously such that the lines are very blurred between herself, the City, and the property manager. **The conduct and control of Ms. Smyth and Mr. Vogel has blurred the lines between Ms. Smyth's role as an independent attorney for a property manager and the property manager's corporate existence itself.**

26. I cannot even get the landlord to send me the versions of my lease covering the two year time period that is between September 1, 2021 and August 31, 2023. They literally refuse to provide me with them, which is in and of itself a city violation, like they refuse to provide me with a copy of the key to the door knob to my apartment unit's front door, which occasionally sets me up for periodic lock-outs that are often with my dog, costing me hundreds of dollars for a locksmith, and that only serve to add additional opportunities of embarrassment in front of my neighbors and passers-by on the sidewalk, which I try really hard to pretend don't bother me.

### A CONCERTED ACTION

27. The City's officials are concertedly advancing Benchmark 237, LLC's fraud and other illegalities, such as willful failure to comply with the City's own building maintenance codes, as discussed in more detail below -

28. For example, in early June, 2023, I cited ten code violations on "311" and requested that a code enforcement official come out to inspect my apartment building and my apartment unit. My initial telephone appointment with the Housing and Preservation Department's Code Enforcement line was on June 7, 2023. Then, my walk-through inspection was on Sunday, June 11, 2023. During the inspection, I told the inspector that the landlord hadn't painted the apartment in all the time that I had been there. (City code provides that the landlord is supposed to paint the unit every two years). I further advised the City official while inside my apartment, that my lease is terminating on August 31 2023. In addition, I told him that I desired the apartment to be painted as soon as practicable, in part because plaster is falling from the ceiling. We also talked a bit about some of the problems I was experiencing with my landlord. Before leaving, the City official actually said, honest to God, that it was not his job to enforce the City code. I was flabbergasted. If not his, then whose is it? I had even gone above and beyond by researching the City code myself and had in my mind when I was talking to him, the applicable sections of the Building Maintenance Code while he did his walk-through and we went through certain issues that I had reported. He didn't write any of them down or take me seriously, at all. Before he left, he told me that I would get a copy of his report in five to seven days. That was seventeen days ago and I've still not received the report. Instead, I called the Code Enforcement division of the Housing and Preservation Department the week of June 12, 2023, and the same friendly and competent customer service representative told me that he had written in his report

(she must have been looking at a copy of it), that he was giving the landlord until September 15, 2023, to paint the apartment, which is fifteen days *after* the guy knows, full well, that my lease expires. He also knew how tidy and ready my apartment is, and that the falling plaster from the ceiling needs to be repaired as soon as practicable. Despite all the facts to the contrary, which command the plaster and paint take place as soon as practicable given the noncompliance with code and the long past-due nature of such repairs, he is setting aside his own role to enforce the code and is instead perpetuating the landlord's own goal of noncompliance with it, and harassment of me. This is just one little example of the concerted effort of the City in bed with the landlord. I believe that I could discover more during the discovery process.

OTHER NON-PARTY RELEVANT ACTORS

29. The U.S. Department of Veteran's Affairs. ("The VA") provides the Complainant with a monthly annuity based on a service-connected disability or disabilities.

30. New York Community Bank, Inc. The financial institution that presumably acquired Signature Bank's November 18, 2018 mortgage agreement with Benchmark 237, LLC, when New York Community Bank, Inc.'s wholly-owned subsidiary of Flagstar Bank, N.A., acquired all of Signature Bank's notes as of on or about March 20, 2023.

31. Benchmark 237, LLC's unidentified members.

32. Benchmark 237 Manager, LLC's unidentified members.

33. Benchmark 237 Equity, LLC's unidentified members.

FEDERAL JURISDICTION

34. This court is an appropriate jurisdiction to hear this case and the parties given the subject matter jurisdiction of Federal courts over primarily-Federal civil rights issues involving

the interpretation of the applicability of 42 U.S.C. Sec. 2000e—2 (The Civil Rights Act of 1964, as amended), including the possible scope of the applicability of 42 U.S.C. §§ 2000e-7 & 11 which relates to special rights and entitlements for veterans such as the Complainant.

35. Federal courts have personal jurisdiction over the Complainant given the many nexuses of the Complainant to the Federal government. He is a pilot certified by the U.S. Department of Transportation's Federal Aviation Administration, an annuitant with the U.S. Department of Veterans Affairs, and a claimant with the U.S. Department of Labor.

VENUE

36. The Eastern District at Cadman Plaza is a proper venue given its proximity to the plaintiff's residence in New York County as well as one of his office sites in Kings County. In addition, Benchmark 237, LLC's principal place of registered business is Suffolk County. Both Kings and Suffolk counties are included within the Eastern District's geographic area of responsibility.

ADMINISTRATIVE REMEDIES EXHAUSTED

37. I seek relief in this honorable court of law only after the Defendants have waived immunity, including sovereign immunity, by granting me the express, not just implied, permission to sue them. Specifically, the City of The City of New York, through its Office of the Comptroller, waived sovereign immunity on June 27, 2023. (reference: Office of the City Comptroller claim no. 2023PI019389). Christina Smyth, the retained counsel and attorney for Benchmark 237, LLC, acknowledged via e-mail on June 5, 2023, of my intent to sue Benchmark 237, LLC.

RELIEF

39. **To the Complainant from the City of New York** for the complainant's personal injuries, civil rights violations, human rights violations, and for the emotional distress and mental suffering of the Complainant, inflicted upon him by the police force whose officers over-used their authority and abused their power while responding to complainant's own calls for help to them, **$2,500,000**, including punitive relief. The complainant's anguish and mental strife injuries are active and ongoing daily and are very prominent in his mind all of the time. The complainant's damages and mental health injuries are worse because of his Military Sexual Trauma. According to a recent document published by the New York Legal Aid Society, the NYPD has had to pay upwards of $10 million for the very same types of injuries raised within this complaint, granted on a greater scale. $2,500,000 is reasonable and in line with recent Court precedent for other similar civil rights violations within the last couple years, and it is scaled to the relief he is seeking from his landlord.

40. For Benchmark 237, LLC, the landlord, for repair expenses to damaged real property, **$5,000.** The complainant's lessor has labor and supplies expenses associated with the repair of damage to real property that resulted from the NYPD's overuse of authority and show of force on April 4, 2023. This includes such things as painting and a wooden door repayment that was shattered when the NYPD burst through it. The complainant believes that he was careful in thinking through such damage that was and was not attributable to the NYPD based on their response, and what their response *should have* looked, and he believes that he is only including expenses based on the unnecessarily large response. The Complainant has the burden of bearing such expenses in the first instance since the Complainant's lessor did not bear such expenses in the first instance itself, and the only way that the Complaint could hope to get

reimbursed for such expenses is through the filing of this Complaint which includes the lessor's interests. (source: June 5, 2023 and June 16, 2023 e-mails between Complainant and the lessor's attorney Ms. Smyth).

41. **Attorney fees.** Apportioned/allocated among the respondents. The complainant has put in hundreds of hours, to research the extent to which he has been victimized by the respondents in causes of action under the law, and he hopes to retain counsel to help bear the burden at court or to try to settle with the plaintiffs. **$175,000**.

42. **Legal costs**. Apportioned/allocated among the respondents. Complainant must pay more than $**400** to file this document. This number will only increase as litigation proceeds.

43. Injunctive relief in an order issued by this Court to Benchmark 237, LLC to compel the landlord to reveal to Complainant the identity(ies) of the members of Benchmark 237, LLC, so that the Complainant may have information he is entitled under the law - the benefit of knowing the identiy(ies) of the individuals at the heart of the business and with which he is disputing, so that he may know the folks that are driving settlement decisions.

44. Monetary relief of **$40,000** from Benchmark 237, LLC, for each act, instance, and/or omission by/of Benchmark 237, LLC, related to April 4, 2023, that is in and of such acts, instances, and omissions, violates law or regulation governing the Complainant's tenancy and that relate to April 4, 2023, such as acts, instances or omissions that are tantamount to tenant harassment and infliction of emotional distress. Complainant will later list such acts and omissions, including instances that demonstrate a pattern and theme of tenant harassment and the emotional distress intentionally inflicted upon the Complainant by his landlord and the landlord's agents and alter egos, following April 4, 2023.

45. Punitive relief of **$8,000,000** from Benchmark 237, LLC, to the Complainant, which is an amount in line with prior court precedent of cases involving similar facts of mortgage fraud and bully landlords who think themselves above the law, such as this case from 2017 where the "plaintiff," the Attorney General of the State of New York, prevailed in a verdict of $8 million for tenants harassed by their landlord in 2017, just like I am today. (https://www.law.com/newyorklawjournal/2017/12/21/new-york-city-landlord-to-pay-8m-in-tenant-harassment-suit/?slreturn=20230526200712 52).

46. Punitive relief of **$4,000,000,** from The City and from Benchmark 237, LLC to the establishment of a fund, to help underserved New Yorkers struggling to deal with their own issues pertaining to local law enforcement, bullying, tenant harassment, and substance abuse.

## CERTIFICATION

46. Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

## FURTHER CERTIFICATION APPLICABLE TO *PRO SE* PARTIES

47. I will provide the Clerk's Office with any changes to my address where case-related papers may be served, and I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

## AFFIRMATION OF SERVICE

48. I swear under oath that I served a copy of this Complaint upon the Defendants, whose addresses are listed above under the "Parties" heading.

SIGNED:

_____          June 30, 2023
JOSEPH ANTHONY HOF                        DATE

237 E. 10TH ST. #5A
NEW YORK, NY 10003
314-808-0861
JOSEPH.A.HOF@gmail.com